UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TOMMY LEE BANKS,

                    Plaintiff,

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security

                    Defendant.

---

**DECISION AND ORDER**
**No. 12-CV-6239T**

## INTRODUCTION

Tommy Lee Banks ("Plaintiff") brings this action pursuant to Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") John P. Costello was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings is granted, and Plaintiff's motion is denied. Plaintiff's complaint is dismissed with prejudice.

## PROCEDURAL HISTORY

On June 24, 2008, Plaintiff protectively filed for SSI benefits, alleging disability beginning on July 17, 2008. Administrative Transcript ("Tr.") 115-118. His claim was denied on October 22, 2008. Tr. 77. At Plaintiff's request, an administrative hearing was held on December 15, 2009, before ALJ John P. Costello in Rochester, New York. Tr. 35-66. Plaintiff, who was represented by attorney Gregory Fassler, testified at the hearing. Id. Peter A. Manzi, an impartial vocational expert, also testified. Id.

On January 7, 2010, the ALJ denied Plaintiff's claim. Tr. 18-34. He found that Plaintiff had not been under a disability within the meaning of the Social Security Act since the date the application was filed. Id.

On March 5, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4. This action followed.

## FACTUAL BACKGROUND

Plaintiff claimed that he was disabled due to post traumatic stress disorder ("PTSD"), anxiety, depression, and left eye blindness. Tr. 39. At the hearing, Plaintiff argued that he was "unable to sustain any one of the basic mental demands of even unskilled sedentary work and should, therefore, be found disabled under Social Security ruling 85-15." Tr. 39. Prior to the period

at issue, on April 18, 2005, Plaintiff was treated at Strong Memorial Hospital ("Strong") for gunshot wounds to the face, chest, and abdomen.  Tr. 222.

## A.   Non-Medical Evidence

Plaintiff was born on June 3, 1964, and was 44-years-old at the time of filing.  Tr. 115.  He completed the eleventh grade with special education classes.  Tr. 131.  Plaintiff lives alone in an apartment, and testified that he performed his own personal care. Tr. 48, 134.  He also testified that he could not see from his left eye.  Tr. 54.  He alleged recent pain in his back during the week before the hearing and headaches "every now and then."  Tr. 55-56.

Plaintiff reported that he spent most of his time at home because he did not trust himself around other people.  Tr. 42.  He stated that he felt "nervous and scared" to be in public, that he believed other people were talking about or looking at him when he was in public, and that other people intended to hurt him.  Tr. 44, 49.  He denied anxious feelings around his family.  Tr. 44. Plaintiff claimed that he would leave his home only to go to medical appointments, or to go grocery shopping with his family. Tr. 42-43.  He testified that he was able to walk down the street alone to go to the corner store.  Tr. 43.  He did not have a driver's license, so he rode the bus to medical appointments. Tr. 49.  Plaintiff stated, however, that riding the bus was "very difficult" for him.  Tr. 49.

Plaintiff stated that he cleaned his apartment often. Tr. 47. He reported that he had no difficulty grabbing objects, standing, or walking. Tr. 55-56. He denied difficulty talking to others, and he testified that he read books and the newspaper and watched the news on television. Tr. 48, 51.

Plaintiff complained of panic attacks occurring for half an hour two to three times per week with pressure in his chest. Tr. 44-45. He testified that he missed one doctor's appointment because he was not calm enough to leave his home. Tr. 50. Plaintiff also stated that nightmares of being shot disrupted his ability to sleep. Tr. 46. He alleged bouts of sadness and tearfulness and claimed not to like himself sometimes. Tr. 52. He denied suicide attempts. Tr. 53.

Plaintiff testified that he was seeing a therapist, and that he had a case manager for two and a half years to assist in his daily living. Tr. 42, 52, 58. He said he needed others to remind him of upcoming events. Tr. 53-54. Plaintiff also stated that he took medications on a regular basis for his alleged psychiatric problems. Tr. 53. He said the medications "kep[t] him together," but that he still had symptoms on a daily basis. Tr. 53.

At the hearing, impartial Vocational Expert ("VE") Peter Manzi testified that Plaintiff's past work as a painter constituted "medium work" and is considered "skilled" under the Social Security Regulations. Tr. 62. He stated that, because Plaintiff lacks

depth perception, he would not be able to perform this past work. Id. The ALJ asked Mr. Manzi to assume an individual with the same vocational profile as Plaintiff who could do work at all exertional levels but did not have bilateral vision and would work primarily alone with occasional supervision. Id. Mr. Manzi testified that such an individual could be a bagger (Dictionary of Occupational Titles ("DOT") No. 920687014) or a laundry worker (DOT 361385018). Id. The ALJ then added to the above hypothetical, by including the restriction that the individual had to work primarily with things instead of people. Tr. 63. Mr. Manzi testified that such an individual could be a hand packager (DOT 920587018) and a laundry worker.

B.  **Relevant Medical Evidence**

    I.   **Evidence Prior to Plaintiff's July 17, 2008 Application**

On March 28, 2007, Plaintiff visited Strong and claimed that he had recently been diagnosed with PTSD, that he was seeking psychiatric treatment, and that he was doing "very well." Tr. 213-14. At that time he was enrolled in individual counseling and medication management treatment. Tr. 236-97. In a treatment plan from July 23 to October 23, 2007, Dr. Nancy Cain, a psychiatrist, and Ms. Melissa Sydor, a therapist, reported that Plaintiff had a current global assessment of functioning ("GAF") of 60 with a GAF

of 65-70 for the past year.[1]  Tr. 286-87.  In a treatment plan from October 23, 2007, to January 23, 2008, Dr. Cain and Ms. Sydor reported that Plaintiff had a current GAF of 55 with a GAF of 65-70 for the past year.  Tr. 288-89.

Several mental status examinations performed in 2007 revealed that Plaintiff exhibited normal thought contents, full-to-fair ranges of affect, cooperative behavior, normal orientation, normal motor behavior, but a higher level of anxiety.  Tr. 279-83, 290-97. Plaintiff often reported feeling well and sleeping better, but his mood was dependent on his pain level.  Tr. 282, 290-97.  His medications (Zoloft and Hydroxyzine) were helpful in controlling his symptoms.  Id.

From December 27, 2007, to March 6, 2008, Plaintiff sought treatment with Mr. Virgilio DeSio, a licensed social worker.  Tr. 270-80.  At each visit, Plaintiff displayed appropriate affect, an organized thought process, and good concentration.  Tr. 270, 273, 276-79.

At the December 27, 2007 appointment, Plaintiff spoke about the good support system he had with his siblings and his daughter, and he reported that he spent several days a week watching his grandchildren and spending time with his family.  Tr. 279.  At that

_____

[1] A GAF between 51 and 60 equates to "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning."  See American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF between 61 and 70 equates to some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships.  Id.

same session, Plaintiff expressed his wishes to obtain a letter from either his doctor or therapist to bring to his court hearing. Id. Two weeks later, on January 10, 2008, Plaintiff again asked Mr. DeSio for a letter for the Social Security Administration ("SSA"). Tr. 278. Mr. DeSio refused, and Plaintiff stated, "I only want the letter for Social Security, so I can move forward with my life." Id. Mr. DeSio recommended group therapy, to which Plaintiff responded, "I don't want to hear other people's problems, I want a letter to help me with my problems." Id. Plaintiff refused group therapy because it is "good for others but not him," and stated, "all I need to solve my problems is a letter to get my benefits." Id.

On February 7, 2008, Mr. DeSio recommended that Plaintiff volunteer his time to help juvenile delinquents. Tr. 276. Plaintiff stated that he felt "this would be very helpful for him," and he asked Mr. DeSio to obtain information about how he could become involved. Id. On February 21, 2008, Mr. DeSio recommended that Plaintiff contact Vocational and Educational Services for Individuals with Disabilities ("VESID") to help him find a job. Tr. 273. At this appointment Mr. DeSio declined Plaintiff's request to appear in court on his behalf, because "at this point [he] did not see a mental health disability that would prevent [Plaintiff] from working." Id.

From March 11 to July 7, 2008, Plaintiff attended therapy sessions approximately every two weeks with Ms. Sydor. Tr. 251-269. On April 14, 2008, Plaintiff visited Ms. Sydor and reported increased nightmares and stress "over his social security and feeling like his shooting has not been tak[en] seriously." Tr. 266. Id. Ms. Sydor recommended he visit the park once a week to relax, and she referred him to case management services to help him with SSA applications and low income housing. Id.

On May 13, 2008, Plaintiff reported an improved mood after connecting with family and friends, that he tried to spend some time every day outside of his home, and that his nightmares had stopped. Tr. 259-60. In Plaintiff's treatment plan from May 12 to August 12, 2008, Dr. Cain and Ms. Sydor reported a current GAF of 55 and a GAF of 65-70 for the past year. Tr. 261.

On June 16, 2008, Plaintiff visited Strong for symptoms consistent with an anxiety attack. Tr. 196-97. On June 23, 2008, at an appointment with Ms. Sydor, Plaintiff reported increased nightmares due to his SSD denial and family conflicts. Tr. 256.

On July 1, 2008, Dr. Cain reported that Plaintiff had increased anxiety, verbal aggression, passive suicidal ideation, and physical aggression to objects. Tr. 253-54. On July 7, 2008, during a session with Ms. Sydor, Plaintiff reported the urge to isolate more due to nightmares. Tr. 251-52.

### ii.  Medical Evidence from the Relevant Period

On July 21, 2008, Ms. Sydor noted that Plaintiff had a full range of affect, a depressed mood, and a tangential thought process.  Tr. 249.  On July 23, 2008, Plaintiff complained of headaches at a followup appointment at Strong.  Tr. 194-95.  The doctor noted that switching from Zoloft (a side effect of which is headaches) to another medication might help.  Id.

On August 1, 2008, at an appointment with Dr. Cain, Plaintiff stated that his medications were helping to calm him and that his anxiety and depression had decreased significantly.  Tr. 247-48. He only experienced anxiety while riding the bus.  Tr. 247.

In a treatment plan dated August 12 to November 12, 2008, Dr. Cain and Ms. Sydor assessed a current GAF of 50 and a GAF of 55 in the past year.  Tr. 243.  On August 26, 2008, Plaintiff visited Strong and reported that his headaches had improved.  Tr. 337-38.

On September 2, 2008, at an appointment with Ms. Sydor, Plaintiff reported that his dreams were less violent.  Tr. 240. Ms. Sydor worked with Plaintiff on changing his thoughts when he recognized anxiety triggers.  Id.

On September 16, 2008, Karl Eurenius, M.D., performed a consultative examination of Plaintiff at the Commissioner's request.  Tr. 224-28.  Plaintiff complained of PTSD secondary to a gunshot wound.  Tr. 224.  He also claimed to have hypertension and hyperlipidemia, both of which were managed well with medication.

Id. At this time, Plaintiff's medications included Lisinopril (20 mg), Hydrochlorothiazide (25 mg), Bupropion (100 mg), Hydroxyzine (50 mg), Aspirin (81 mg), Lipitor (40 mg), Sertraline (100 mg), and Motrin (600 mg). Tr. 225.

Plaintiff reported that, in 2005, he was shot from approximately 10 feet away with a 20 gage shotgun and pellets went into his eye. Tr. 224. As a result, he is completely blind in his left eye and has a fiberglass pupil. Id. He complained of flashbacks and anxiety related to the shooting. Id. Plaintiff also reported migraine headaches that occurred from two to ten times a month, which he treated with Bufferin and seclusion. Id. Plaintiff cooked, cleaned, did laundry, shopped, showered, bathed, and dressed himself, but reported that he needed reminders for doing these things. Tr. 225.

Dr. Eurenius reported that Plaintiff appeared to be "in no acute distress." Id. He walked with a normal gait, and had a full squat and normal stance. Id. Plaintiff needed no help getting on or off the examination table and rose from the chair without difficulty. Id. He had trouble standing on his toes due to pain in his left foot. Id. Examination revealed a regular heart rhythm. Tr. 226.

Dr. Eurenius reported that Plaintiff was "very muscular." Id. He had full flexion in the lumbar and cervical spine. Id. His straight leg raising test was positive at 45-degrees, and he showed

full range of motion in his shoulders, elbows, forearms, wrists, hips, knees, and ankles. Id. Plaintiff exhibited some weakness in dorsiflexion and plantar flexion of the left foot. Id. He had a scar on his left foot with some minor sensory loss to pinprick and touch without atrophy, varicosities, or trophic changes. Tr. 227.

Dr. Eurenius diagnosed hypertension, hypercholesterolemia, migraine-like headaches, post debridement of left foot infection, and status post gunshot wound to the left eye with left eye blindness and psychological symptoms. Id. He reported that Plaintiff's blood pressure and lipid profiles were in good control. Id. He also noted that Plaintiff retained reasonable vision in his right eye and that he had an improving left foot infection. Id. Dr. Eurenius opined that Plaintiff was "moderately limited in long distance walking and climbing stairs, lifting, and carrying until his foot [was] full[y] recovered." Id. Plaintiff was "minimally limited in vision due to left eye blindness." Id.

On September 24, 2008, Dr. Maureen McAndrews, a psychiatrist, consultatively evaluated Plaintiff at the Commissioner's request. Tr. 229-35. Plaintiff claimed that he was unable to work because he could not lift more than 10 pounds due to his gunshot wound and because he could not see well on his left side. Tr. 229. Dr. McAndrews noted that Plaintiff did not report such lifting limitations at his appointment with Dr. Eurenius two weeks earlier. Id. Plaintiff also alleged that he could not work because he had

trouble standing on his left foot due to a prior foot surgery, and because he had PTSD as a result of being shot. Id. He also indicated that he could not spell well, but could add, subtract, and read. Id.

Plaintiff said that psychiatric medications (Bupropion and Sertraline) to help him sleep and control traumatic dreams helped him somewhat. Tr. 230. He said that he could fall asleep, but claimed that he woke frequently due to "horrible dreams." As a result, he experienced fatigue, loss of energy, and irritability. Id. Plaintiff denied crying spells, feeling hopeless, and concentration difficulties. Id. He reported no self-esteem problems, feelings of worthlessness, or suicidal ideation. Id. He denied throwing or breaking things, and hitting or hurting others. Id.

Plaintiff claimed symptoms of PTSD including difficulty concentrating, irritability, nightmares, flashbacks, hyper startle response, and hypervigilance. Id. He reported that he feared leaving his home, being around others, and taking the bus. Tr. 230-31. Plaintiff also described panic attacks occurring at least once a week with palpitations, sweating, chest pain, breathing difficulty, and trouble focusing. Tr. 231. He denied any history of drug or alcohol use. Id. He reported that, in 1993, he spent one year in jail for an assault conviction. Id. He also said that he served in the National Guard for three weeks, but received a

dishonorable discharge because he was "not paying attention."
Tr. 232.

Dr. McAndrews's mental status examination revealed that Plaintiff had coherent and goal directed thought processes with no evidence of hallucinations, delusions, or paranoia. Id. Plaintiff displayed a full range of affect that was appropriate to speech and thought content, and his mood was euthymic. Id. His attention, concentration, and memory were mildly impaired. Tr. 232-233. Dr. McAndrews estimated that Plaintiff's cognitive functioning was in the average range, with fair insight and judgment. Tr. 233.

Dr. McAndrews diagnosed Plaintiff with mild depressive disorder, complex bereavement, panic disorder without agoraphobia, PTSD, high blood pressure and cholesterol, left eye blindness, and migraines. Tr. 234. She opined that Plaintiff could "follow and understand simple directions and instructions and perform simple tasks," and that he could "learn new tasks and perform complex tasks." Tr. 233. Plaintiff's ability to maintain attention and concentration was somewhat limited due to PTSD. Id. He experienced moderate limitations in his ability to make appropriate decisions, relate adequately with others, and deal appropriately with stress. Tr. 234. Dr. McAndrews concluded that Plaintiff's impairments "may significantly interfere with [his] ability to function on a daily basis," but that his prognosis was fair because

he complied with his medications, medical care, and mental health care, and he was motivated to work.  Id.

On October 16, 2008, Dr. L. Blackwell, a state agency psychologist, reviewed the medical evidence of record.  Tr. 298-315.  Dr. Blackwell opined that Plaintiff did not have a medical impairment that met or equaled the criteria for an impairment listed in 20 C.F.R. Part 404, Subpart A, Appendix 1.  Id. Specifically, he opined that, under Listing 12.06 of the Social Security Regulations (Anxiety Related Disorders), a medically determinable impairment was present that did not precisely satisfy the diagnostic criteria of the listing.  Tr. 303.  Dr. Blackwell opined that Plaintiff experienced mild limitations in daily living and moderate limitations maintaining social functioning, concentration, persistence or pace.  Tr. 308.

Dr. Blackwell summarized the medical evidence of record, including Plaintiff's allegations, his treatment at Strong, and his consultative evaluation.  Tr. 314.   Based on the available evidence and his own evaluation, Dr. Blackwell concluded that Plaintiff had "no more than mild to moderate functional limitations" and that "he appear[ed] capable of a[t] least simple work in an environment that does not require him to work closely with others."  Id.

Plaintiff continued psychiatric treatment with Ms. Sydor and Dr. Cain from October 27, 2008, through October 19, 2009.  Tr. 392-

93, 412-90.  At the sessions from December 31, 2008, through June 22, 2009, Ms. Sydor reported that Plaintiff had a full range of affect and a neutral mood.  Tr. 452-53, 456-57, 460-61, 464-65, 468-69, 474-75, 479-80, 481-82, 485-90.  On December 31, 2008, Plaintiff reported he was doing well.  Tr. 490.

On February 4, 2009, Plaintiff reported to Ms. Sydor that he injured his knee but did not go to the emergency room for care.  Tr. 482.  On February 18, 2009, Plaintiff reported that he "ha[d] no concerns" and that he felt things were going well.  Tr. 480.  On April 14, 2009, Plaintiff complained to Ms. Sydor of torn ligaments in his knee.  Tr. 469.  The next day, Plaintiff visited Strong complaining of pain in his right knee from a fall.  Tr. 397.  Examination revealed varus stress with no instability or patellar tenderness.  Id.

Ms. Sydor's treatment notes from February 25 to May 29, 2009, indicated that Plaintiff had a current GAF of 48 and a GAF of 50 in the past year.  Tr. 476.  On March 18, 2009, Dr. Gloria Baciewicz, a psychiatrist with Strong Behavioral Health, opined that Plaintiff was unable to leave his home and interact with people.  Tr. 470-73.

From July 6 through August 17, 2009, Plaintiff attended group therapy sessions.  Tr. 426, 429, 433, 438, 441-43, 447.  He was always able to maintain attention during these group sessions.  Id.  Plaintiff reported to Ms. Sydor a few times, however, that the group therapy sessions made him anxious.  Tr. 430-31, 434-35, 450-

51. But on July 27, 2009, Plaintiff commented at his group session that "his anxiety is more tolerable for coming to the group and he is pleased that he has been doing it." Tr. 433.

On August 5, 2009, at an appointment with Dr. Baciewicz at Strong, Plaintiff complained of right knee pain when walking. Tr. 396. He reported that medication relieved his knee pain until he ran out of it, and that his insurance would not cover physical therapy. Id. Plaintiff complained of pain on straight leg extension. Id. Examination revealed no effusion around the right knee. Id.

On September 30, 2009, Ms. Sydor assessed Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting based on how his mental/emotional capabilities were affected by his impairments. Tr. 404. She opined that Plaintiff had a fair ability to follow work rules, use judgment, function independently, and maintain attention. Id. Ms. Sydor also opined that Plaintiff had a poor ability to relate to co-workers, deal with the public, interact with a supervisor, or deal with work stress. Id. She said Plaintiff's PTSD symptoms hinder his ability to interact with people and that he is paranoid of being hurt or attacked by others. Id.

On the same day, Ms. Sydor helped Plaintiff complete SSA paperwork. Tr. 418-19. She noted that Plaintiff had difficulties with spelling and reading comprehension. Id. Evaluation that day

revealed that Plaintiff had a full range of affect and a neutral mood.  Id.

On October 19, 2009, at an appointment with Dr. Cain, Plaintiff denied concerns and reported that medication was helpful. Tr. 412.  He reported that he was able to "get out more and do more things."  Id.  Dr. Cain assessed that Plaintiff presented no risk of self-injury, aggressive behavior, or suicidal or homicidal ideation.  Id.

## DISCUSSION

## I. Jurisdiction and Scope of Review

Title 42 U.S.C., Section 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits.  Mathews v. Eldridge, 424 U.S. 319, 320 (1976). When considering such a claim, the section directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. See Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998); see also Williams v. Comm'r of Soc. Sec., No. 06-CV-2019, 2007 U.S. App. LEXIS 9396, at *3 (2d Cir. Apr. 24, 2007).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 217 (1938).  The Court's scope of review is thus limited to determining whether the Commissioner's findings were supported by substantial evidence in

the record, and whether the Commissioner employed the proper legal standards in evaluating Plaintiff's claim. Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)(finding that a reviewing Court does not try a Social Security benefits case *de novo*). The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex. 1983).

Judgment on the pleadings pursuant to Rule 12(c) may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that Plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. See generally Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

## II. **The Commissioner's Decision to Deny Benefits is Supported by Substantial Evidence in the Record.**

In his decision denying benefits, the ALJ followed the required five-step analysis for evaluating disability claims.[2] Tr.

---

[2] The five-step analysis requires the ALJ to consider the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities; (3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No.4, if so, the claimant is presumed disabled; (4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work; (5) if the claimant's impairments prevent him or her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors,

21-30.  At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date.  Tr. 23.

At steps two and three, the ALJ concluded that Plaintiff had the following severe impairments: blind left eye, depressive disorder, and PTSD.  Id.  He found, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).  Id.  The ALJ also noted that the record showed that Plaintiff suffered from a left foot infection in 2007, but that the wound healed completely and Plaintiff was able to ambulate without difficulty.  Id.

At steps four and five, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: Plaintiff cannot engage in work requiring intact bilateral vision, and he must work exclusively with things rather than people.  Tr. 26.  The ALJ found that, given Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform (20 C.F.R. 416.969 and 416.969(a)).  Tr. 29.  Thus, the ALJ correctly concluded that Plaintiff was not disabled within the

the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

meaning of the Social Security Act.  This Court finds that the ALJ's decision is supported by substantial evidence in the record and is based on the appropriate legal standards.

### A.   **The ALJ's Residual Functional Capacity Finding is Supported by Substantial Evidence.**

In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory, and other requirements of work.   20 C.F.R. § 404.1545(a)(3)-(4); see also SSR 96-8p, SSR LEXIS 5, 1996 WL 374184(S.S.A. July 2, 1996).   Here, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but that he could not engage in work requiring intact bilateral vision and he had to work exclusively with things rather than people.  Tr. 26.  In making this determination, the ALJ considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence (based on the requirements of 20 C.F.R. 416.929 and SSRs 96-4p and 96-7p), and he considered opinion evidence in accordance with the requirements of 20 C.F.R. 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  Id.

Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence because he did not provide a finding as to Plaintiff's abilities to perform the basic mental demands of competitive, remunerative, and unskilled work.  Pl.'s

Mem. at 9-10. As Defendant notes, however, the ALJ did consider Plaintiff's ability to meet the basic mental demands of unskilled work. Tr. 25-26. He discussed the findings of both Ms. Sydor, Plaintiff's treating therapist, and Dr. McAndrews, a consultative psychiatrist. Id. The opinion and findings of Dr. McAndrews, as previously discussed (at pages 11-13), are consistent with the ALJ's RFC determination. Tr. 25, 229-235. Dr. McAndrews concluded that Plaintiff could follow simple directions and could complete both simple and complex tasks, but that he had limited ability to make appropriate decisions and work with others. Tr. 233-34. Furthermore, the ALJ's RFC determination is consistent with the opinion of Dr. Blackwell, a State agency psychologist. Dr. Blackwell opined that Plaintiff appeared capable of at least "simple work in an environment that does not require him to work closely with others." Tr. 314. The ALJ's decision to give great weight to the opinions of the consultative examiners was not improper. Tr. 29. A consultative physician's opinion may constitute substantial evidence in support of the ALJ's determination. See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Mongeur v. Heckler, 722 F.2d at 1039. As explained, Dr. McAndrews's and Dr. Blackwell's findings supported the ALJ's RFC determination. For these reasons, this Court finds that the ALJ's RFC determination is supported by substantial evidence in the record.

**B.    The ALJ Evaluated the Treating Therapist's Opinion in Accordance with the Appropriate Legal Standards.**

Plaintiff alleges that the ALJ was obligated to give controlling weight to Ms. Sydor, Plaintiff's treating therapist, and that he did not evaluate her opinion in accordance with the appropriate legal standards.  Pl.'s Mem. at 9-10.  The ALJ gave little weight to Ms. Sydor's reports, "as she is a therapist and not an acceptable medical source, in a case where multiple physicians have provided information regarding [Plaintiff's] residual functional capacity."  Tr. 28-29.  The ALJ also stated that Ms. Sydor's opinion that Plaintiff could not work due to mental impairments contradicted her own findings in numerous mental status examinations conducted in 2008 and 2009.  Tr. 29, 406-08.

It is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)); Schaal v. Apfel, 134 F.2d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").  Furthermore, according to SSR 06-3p, "only 'acceptable medical sources' can be considered treating sources... whose medical opinions may be entitled to controlling weight."  SSR 06-3p.  "Acceptable medical sources" are further defined by regulation as

licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. 416.913(a). In contrast, therapists are defined as "other sources" whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight. 20 C.F.R. 416.913(d)(1). The ALJ "has the discretion to determine the appropriate weight to accord the [other source]'s opinion based on all the evidence before him." Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995); see also Genier v. Astrue, 298 F. App'x 105, 108-09 (2d Cir. 2008) ("[M]any of the key medical opinions cited during the benefits period at issue were those of a physician's assistant and a nurse practitioner – and not a physician. As such, the ALJ was free to discount the assessments accordingly in favor of the objective findings of other medical doctors. There was no treating physician error."); see also Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

Therapist Sydor was an "other source" rather than an acceptable medical source under the Regulations and, thus, she could not be a "treating source" for purposes of the treating physician rule. The ALJ did not err in declining to afford Ms. Sydor's mental functioning assessment greater weight because Ms. Sydor's opinion report was inconsistent with her own treatment notes. In particular, at the sessions Plaintiff attended with Ms. Sydor from December 31, 2008, through June 22, 2009, she noted

Plaintiff had a full range of affect and a neutral mood. Tr. 29, 452-53, 456-57, 460-61, 464-65, 468-69, 474-75, 479-82, 485-90. Yet in her assessment about Plaintiff's ability to do work-related activities, Ms. Sydor opined that Plaintiff was disabled from employment because he struggled to ride the bus and because he had PTSD and panic attacks. Tr. 405. In that same assessment, however, Ms. Sydor opined that Plaintiff had a fair ability to follow work rules, use judgment, function independently, and maintain attention. Tr. 404. But she also opined that Plaintiff had a poor ability to relate to co-workers, deal with the public, interact with a supervisor, or deal with work stress. Id. This opinion, that Plaintiff could not work successfully with others, is consistent with the ALJ's finding that Plaintiff must work primarily with things instead of people.

Additionally, Plaintiff argues that his GAF at the time Ms. Sydor offered her opinion was 50, and that his highest GAF was 55 in the past year.[3] GAF scores, however, have no direct correlation to Social Security requirements. Def.'s Reply Mem. at 4; see Fed. Reg. 50746, 50746-65 (Aug. 21, 2000) ("We did not mention the GAF scale to endorse its use in the Social Security and SSI disability programs, but to indicate why the third sentence of

---

[3]An individual with a GAF score of 51-60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning. See American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). An individual with a GAF score of 41-50 indicates serious symptoms or an serious impairment in social, occupational, or school functioning. Id.

the second paragraph of proposed 12.00D stated that an individual medical source 'normally can provide valuable additional functional information.' [...] The GAF scale... is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental listings.").

Finally, the ALJ noted that Ms. Sydor's proposed RFC evaluation of Plaintiff appeared to be based largely on Plaintiff's subjective complaints and allegations. Tr. 29. Because the ALJ found Plaintiff's credibility compromised, he determined that any medical opinion based in part on Plaintiff's allegations was of little value. Id. As discussed below, this Court finds that the ALJ correctly determined that Plaintiff was not credible. Thus, for the stated reasons, this Court finds that the ALJ was not required to give greater weight to therapist Sydor's opinion.

**C.    The ALJ Applied the Appropriate Legal Standards Regarding Plaintiff's Credibility and his Assessment is Supported by the Record.**

Plaintiff argues that the ALJ failed to apply the appropriate legal standards for assessing his credibility.    When assessing a claimant's credibility, an ALJ may not simply state in a conclusory manner that he finds the claimant to be not credible. Rather, the ALJ's decision must contain specific reasons for his finding that are supported by evidence in the record. See SSR 96-7P, 1996 WL 374186, *4 (S.S.A.).  The decision must explain to the individual

and a reviewing court the weight given to the testimony and the reasons for the determination. See id.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's testimony concerning the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent they are inconsistent with the... residual functional capacity assessment." Tr. 28. Plaintiff contends that the RFC determination is unsupported by substantial evidence and is the product of legal error, thus this comparison to the RFC to determine credibility is improper. Pl.'s Mem. at 14. As previously discussed, however, this Court concludes that the ALJ's RFC determination was proper and in accordance with the appropriate legal standards.

The ALJ's decision contained specific reasons supported by the evidence for discounting Plaintiff's credibility, and he correctly evaluated Plaintiff's statements in making his RFC determination. Tr. 27-29; see also SSR 96-3p and 96-7p. As part of his determination, the ALJ noted that Plaintiff's failure to seek followup treatment for alleged physical ailments contradicted his claims of total disability and severe symptoms. Tr. 28. Plaintiff waited two months to seek treatment for alleged knee pain (Tr. 397, 482), and he failed to obtain treatment for complaints of insomnia, back and foot pain, and headaches. Tr. 27.

Furthermore, the ALJ noted that Plaintiff's reasons for seeking treatment damaged his credibility.  Tr. 24.  As discussed previously (at pages 6-7), Plaintiff asked Mr. DeSio several times about getting a letter regarding his alleged disability for SSA.  Tr. 273, 278-79.  He refused group therapy, stating, "I don't want to hear other people's problems, I want a letter to help me with my problem."  Tr. 278.

Plaintiff also made inconsistent statements to his physicians.  He complained of several migraines per month to Dr. Eurenius, but at an appointment with Dr. McAndrews two weeks later, he made no such complaint.  Tr. 224, 229.  At his appointment with Dr. McAndrews, Plaintiff also alleged that he could not lift more than ten pounds due to his gunshot wound, a complaint he had never previously mentioned.  Tr. 25, 229.

Additionally, Plaintiff obtained relief from medication and activities.  He testified that his psychiatric medications "kep[t] him together," and he reported to Dr. Cain that his medications helped calm him.  Tr. 53, 247.  As the ALJ mentioned, the record also reflects that Plaintiff cared for his grandchildren and socialized often with his family.  Tr. 28, 247, 277.  Plaintiff claimed to need reminders, but he could provide his own personal care.  Tr. 27, 225.

"It is the Secretary's function not the district court's to appraise the credibility of witnesses, including the plaintiff."

<u>Serra v. Sullivan</u>, 762 F. Supp. 1030, 1034-35 (W.D.N.Y. 1991).
Thus, for the stated reasons and after a thorough review of the
record, this Court finds that the ALJ's credibility decision is
supported by substantial evidence.

**D.   The ALJ Appropriately Relied Upon the Vocational Expert's Testimony in Making his RFC Determination.**

Plaintiff contends that because the ALJ erred in evaluating
the medical findings and making his RFC determination, the
vocational expert cannot be relied upon to provide substantial
evidence for supporting a denial of disability. Pl.'s Mem. at 17.
Plaintiff argues that because the hypothetical questions posed to
the vocational expert were based upon an RFC determination that did
not accurately and completely describe Plaintiff's limitations, the
vocational expert's testimony is unreliable. <u>Id.</u> Thus, it is
Plaintiff's position that the Commissioner did not meet his burden
at step five of the analysis, which requires a showing that work
exists in significant numbers in the national economy that
accommodates Plaintiff's RFC and vocational factors. As discussed
previously, however, this Court finds that the ALJ's RFC
determination was proper.

Based on his RFC determination, the ALJ correctly posed a
hypothetical question to the vocational expert. The vocational
expert was told to assume an individual with Plaintiff's vocational
profile, who could work at all exertional levels but did not have
bilateral vision and needed to work with things rather than people.

Tr. 62-63. The vocational expert testified that such an individual could be a hand packager and a laundry worker. Tr. 30, 63-64. Thus, based on his proper RFC determination and the testimony of the vocational expert, this Court finds that the ALJ correctly concluded that Plaintiff could perform other work in the national economy.

## **Conclusion**

For the reasons stated, this Court finds that the Commissioner's denial of SSI benefits to Plaintiff was based on substantial evidence in the record and was not erroneous as a matter of law. Accordingly, the Commissioner's decision is affirmed. This Court grants Commissioner's motion for judgment on the pleadings. Plaintiff's motion for judgment on the pleadings is denied, and Plaintiff's complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    June 28, 2013
          Rochester, New York